UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ELIZABETH A. ALLEN, GENE C.      )
MARTIN, DAVID G. MELTON, CAROL   )
MINARD, CAROL SANCHEZ, MICHELLE  )
SISSAC, DEBORAH L. WAGNER, TINA  )
G. WILLS, TERRENCE J. ZMUCKI,    )
JANICE MARTIN, CHARLES MARTIN,   )
MARY ANN LUCAS, KURT             )
FRANCISKOVICH, LUDOVICA ALVAREZ  )
LARRY DUTTON, DIANA RILEY,       )
CARLOS MADAYAG, JOANNE           )
BARANOWSKI, GUY DUFF, RUBY       )
SANDOVAL, CLIFFORD JENKINS,      )
JOHN S. PETRITES, LESLIE WAYNE   )
MORRIS, TOM LAMBERT, MARVIN      )
GINSBURG, WELLINGTON OKOH, LOU   )
RARICK, VICKY LOVE, GONZALEZ,    )
CHRISTINE McKINNEY, CHARLES      )
MANNING, MELISSA ZULFER and      )
MICHAEL J. SNYDER,               )
                                 )
            Plaintiffs           )
                                 )
       v.                        )   Case No. 2:04 cv 128
                                 )
HARRAH'S ENTERTAINMENT INC.,     )
and HARRAH'S OPERATING COMPANY,  )
INC., d/b/a HARRAH'S EAST        )
CHICAGO CASINO & HOTEL d/b/a     )
SHOWBOAT MARINA CASINO           )
PARTNERSHIP,                     )
                                 )
            Defendants           )

<u>OPINION AND ORDER</u>

This matter is before the court on the Motion for Summary
Judgment (DE 91) filed by the defendants, Harrah's Entertainment
Inc. and Harrah's Operating Company Inc., on May 15, 2006, and
the Motion for Hearing (DE 104) filed by the plaintiffs on June
30, 2006.  For the reasons set forth below, the defendants'
motion for summary judgment is **GRANTED**, and the motion for a
hearing is **DENIED**.

Background

Defendants, Harrah's Entertainment, Inc. and Harrah's Operating Company, Inc. ("Harrah's"), operated the Harrah's East Chicago Casino until its sale to Colony Resorts International in April 2005. (Dec. of Byron Clay, ¶ 1) Harrah's employed over 2,000 individuals at the location, including approximately 400 in the table games department. (Clay Dec. ¶ 4) The plaintiffs in this matter were employed as table games supervisors (Third Amended Complaint ¶ 4), and they seek overtime pay according to the Fair Labor Standards Act and compensation for the breach of a promise to pay "comp time."

In ascending order of rank, the table games department at Harrah's consisted of approximately 300 individuals employed as dealers at blackjack, roulette, craps, baccarat, and other gaming tables. (Dec. of Joseph Barrett, ¶ 3) Next, Harrah's employed table game supervisors who were in charge of approximately 100 dealers during a shift, with each table games supervisor main-taining oversight of from two to seven games at a time. (Barret Dec. ¶ 5; Dep. of Larry Dutton, pp. 50-51; Dep. of Christine McKinney, p. 18) The table games supervisors were considered by Harrah's to be Salary Grade 17 employees. (Plaintiffs' Ex. B) It was only at Salary Grade 18 that an employee was considered a "key employee" with "unique knowledge of the company's opera-tion." (Plaintiffs' Ex. C) During a normal shift, the table game supervisors in turn reported to a single casino manager. (Dec. of Josefina Mavathorn, ¶ 2) During the "swing" and "graveyard"

2

shifts, the casino manager was the highest ranking employee in the casino. (Mavathorn Dec. ¶ 2) Otherwise, the casino manager answered to the director of table games. (Barrett Dec. ¶ 3)

Harrah's job description for the table games supervisors stated that their role was to assure "the technical proficiency of all table games employees through development and effective training." (Clay Dec.,  Ex. 3) The table games supervisors were expected to "observe and analyze the integrity of all table games activity" and "mediate and solve[] problems for guests and employees." (Clay Dec.  Ex. 3) The table games supervisors were expected to supervise the "issuance of credit and player track-ing, maintain table game bankroll, prepare periodic reports [and] performance appraisal." (Clay Dec. Ex. 3) Byron Clay, who was employed in the Human Resources Department at Harrah's from December 2000 until April 2005, most recently as Vice President of Human Resources, described the table games supervisor's role to include

> managing game speed, game pace, managing
> limits on games, closing games, moving em-
> ployees from tables, sending people home
> early . . . performance reviews, bringing on
> new employees and reevaluating whether they
> are meeting expectations and make a determi-
> nation whether they continue employment . . .
> evaluating the departments, their pits to
> make sure that customer service is being done
> . . . they're working with customers, resolv-
> ing issues that their dealers can't resolve,
> whether it's payouts or comp issues or how
> they're earnings credits on their reward
> card.
>
> (Clay Dep. p. 28)

On a routine basis, the table game supervisors' tasks included the physical opening and closing of the game tables based upon volume of customer activity, monitoring the dealers and customers, and  approving customer purchases of more than $10,000 in gaming chips. (Mavathorn Dec. ¶ 6) Plaintiffs also were expected to adjust bet minimums. For instance, plaintiff Kurt Franciskovich testified that table games supervisors, with the casino manager, "decide on what to spread games, what to price games and stuff like that." (Dep. of Kurt Franciskovich p. 82; Dep. of Janice Martin, pp. 50-51) However, many of the decisions routinely made by the table game supervisors required approval from others within Harrah's hierarchy. Plaintiff Larry Dutton testified that he did not open or close games without the approval of a casino manager, but he did recommend such activity. (Dutton Dep. p. 47)

Regarding the plaintiffs' oversight of dealers on the casino floor, plaintiff Cody Paredes testified that if a dealer was doing something wrong, he would be the first to notice it. "It would be my responsibility to bring it to management approval, and if they felt that it warranted progressive discipline, then, yes, it would result in a write up." (Dep. of Cody Paredes, p. 44) Paredes stated that if he witnessed a dealer doing something well, he would write a commendation. (Paredes Dep. p. 44) Paredes also testified regarding the relationship between the table games supervisors, the casino managers, and the casino's surveillance department:

4

Q.   I mean, if somebody is behaving oddly,
     and it would be - you would be the one
     that would be called upon to notice
     that, right?

A.   Yes, if I was the one that was right
     there.

Q.   Or if they were, you know, either behav-
     ing oddly, or not performing up to stan-
     dard, or, you know, behaving in a dis-
     tracting fashion, it would be part of
     your job to notice that behavior in a
     dealer, is that right?

A.   Yes, it is my job to tell them if I saw
     that.

Q.   To address it?

A.   To address it.

Q.   Okay.

A.   Yes, or to call it, depending on the
     situation to call the shift manager and
     have them address it.

Q.   Okay. Are you the person that makes the
     calls on bets?

A.   [No Response.]

Q.   I mean, if - if there is some debate
     about whether somebody laid down cards,
     you know, for instance on blackjack in a
     timely fashion, or if there is - some-
     times - you know, I am sure somebody who
     has worked in the casino industry for a
     while you can describe situations with
     players table games supervisors issue
     with the way that they are being paid
     out, or the way things are being handled
     on a game; is that correct?

A.   Yes. Well, there are situations but
     everything is pretty much black and
     white.

Q.   Okay.

> A.   I mean, a player will say, "I didn't get paid properly on this," or, you know, "I had money on that number," in roulette and the dealer swept it in.
>
> Q.   Okay.
>
> A.   You just call surveillance and they will tell you whether or not the money was there, or the dealer paid it properly.
>
> (Paredes Dep. pp 197-199)

The plaintiffs also were expected to rate Harrah's regular customers according to the types of games played, amounts bet, and the player's wins and losses. (Barrett Dec. ¶ 16; McKinney Dep. p. 18) This information was entered into a player's computer profiles and used to determine the amount of "comp" items available to that  player. (Barrett Dec. ¶ 16; McKinney Dep. p. 18)

Certain employees within the table games department were authorized to issue vouchers, referred to as "service recoveries," to dissatisfied customers toward the purchase of a meal, beverage, or other items up to a certain dollar amount. (Barrett Dec. ¶ 17) The casino also had a program through which complimentary items ("comps") such as meals, were provided to customers based upon points earned by the customers and tracked on Harrah's computer system (Barrett Dec. ¶ 16) However, only managers, not the table game supervisors, were permitted to issue comps beyond the amount prescribed by the computer system. (Barrett Dec. ¶ 17) It also appears, based upon the deposition testimony cited by the plaintiffs, that only table game supervisors and higher-ranking employees, not dealers, were permitted to issue service recover-

ies. (Barrett Dec. ¶ 17)  Plaintiffs assert that dealers were able to issue service recoveries. (Statement of Genuine Issues, ¶ 40; Brief in Response, p. 19)

The supervisors also participated in the hiring and develop-ment of dealers in the table games department. Crystal Kessler, a casino manager since October 2003, stated that the table games supervisors "would provide input after an audition for a new hire" to a casino manager, who, in turn, processed the applicant through the casino's Human Resources Department. (Dep. of Crystal Kessler pp. 13, 34) Kessler further described the table games supervisor's role in auditions as assessing whether the applicant "meets our requirements, of course, attitude and personality and appearance all fell into that."  (Kessler Dep. p. 34)

Regarding raises, Kessler testified that if a dealer had the proper documentation, the table games supervisors, pursuant to company guidelines, would "give the employee a rating that would dictate the type of raise they would get." (Kessler Dep. p. 39) Joe Barrett testified similarly that a table games supervisor could not give a raise outside the guidelines but would be re-quired to "collaborate, just as I would." (Dep. of Barrett p. 125)

Table games supervisors were assigned a team of dealers and were responsible for completing biannual evaluations of these dealers, referred to as Performance Appraisal Feedback forms, or PAFs. (Mavathorn Dec. ¶ 9; Dep. of Clifford Jenkins p. 45) According to a guide published by Harrah's entitled "Table Game

Supervisors Guide to Writing Dealer Evaluations," each dealer's evaluation was based on 15 criteria, measuring, among others, the degree to which the dealer maintains an "upbeat and positive attitude," "creates an atmosphere of luck," "builds relation- ships," "follows policies and procedures," and "demonstrates openness to coaching." (Plaintiffs' Ex. D) The guide further provided a five-step process for table games supervisors to follow when rating a dealer under these headings from "inconsis- tent" to "consistently exceeds." The guide provided at times explicit instructions regarding the ratings to be given a dealer, if for instance, the dealer had been given a written or final warning during the review period. (Plaintiffs' Ex. D)

Once completed by the table games supervisor, the PAF was reviewed by a committee whose members included some table games supervisors and then provided to higher level management. (Bar- rett Dep. p. 110)  Plaintiff Cody Paredes, who served on the PAF committee, periodically provided guidance to other table game supervisors regarding the completion of PAFs. In an e-mail regarding a PAF, Paredes wrote the following to another table games supervisor:

> On #6 & #9, there is nothing negative, so you
> can give him [consistently exceeds] in those
> categories. Also, you need to have supervisor
> comments on the PAF about his scores & don't
> forget to mention how he impacts the dealer
> CSA scores. The development plan should be on
> about 3 things that he scored low on. Iden-
> tify his weak areas & then explain how he can
> develop in them. I'm placing it in the PAF
> redo files for you. If you have any ques-

tions, you can ask either myself, Gordon, or
Josie.

(Plaintiffs' Ex. E)

Other plaintiffs, however, minimized the table games
supervisors' role in completing these evaluations. "I mark
everything down the middle because it doesn't matter what we put
on these. It's always changed by our manager and they tell us
what they want us to put. So we hand it to them. That's what I
do. I put it down the middle. I hand it to them, they tell me
where to make the corrections, I correct it and present it."
(Dutton Dep. p. 55)

Nine plaintiffs testified that their role as table games
supervisor also included serving as a "pencil."[1] Plaintiff Arturo
Gonzalez testified that a pencil's role was to assign dealers to
various game tables. "Whatever dealer has to go home, I have to
replace that dealer." (Dep. of Gonzalez, p. 12) Gonzalez further
testified that this determination involved some assessment of a
dealer's skill, for instance, when making assignments to a high-
limit area. (Gonzalez Dep. p. 13; Riley Dep. p. 21) Gene Martin,
another plaintiff who served as a pencil, also testified that
dealers never were assigned without some guidance from manage-
ment. (Martin Dep. pp. 24-25)

Regarding the table games supervisors' wages, Byron Clay
testified that table games supervisors received biweekly pay-

---

[1] Depositions of Baranowski (p. 24); Gonzalez (p. 12); C. Martin (pp.
25-26); G. Martin (p. 24); McKinney (pp. 19-20); Melton (p. 31); Riley (p.
21); Wagner (p. 40); Zulfer (p. 24).

checks that reflected 1/26th of their annual salary. (Clay Dec ¶ 13) Clay further stated, with reference to Harrah's Policies and Procedures Manual and the casino's Employee Handbook, that exempt employees were expected to work beyond 40 hours per week and were not entitled to overtime pay. (Clay Dec ¶¶ 8, 9)

The paystubs received by the plaintiffs every two weeks consistently listed 80 hours of regular work time and an hourly rate of pay. (Plaintiffs' Ex. B) With few exceptions (discussed below), the plaintiffs have testified that they received a "salary" that did not fluctuate based upon the hours that they worked in a given week, and instead, generally was consistent from paycheck to paycheck.[2]

The employees' paid time off (PTO) was accumulated on the basis of a 40-hour week and tallied on the employees' biweekly paystub. (Clay Dec. Ex. 2) In addition, employee data sheets used by Harrah's indicated that the table game supervisors were "salary grade 17" employees who were scheduled to work 80 hours over the course of a pay period. These forms also listed each employee's annual and hourly pay rate. (Plaintiffs' Ex. B)

According to the PTO program, employees were able to schedule paid time off for vacations or sick days based upon their accumulation of PTO time. When an employee utilized PTO, the time

_____

[2] Depositions of Baranowski (p. 18); Dutton (p. 146); Franciskovich (p. 50); Ginsburg (p. 6); Gonzalez (p. 10); Jenkins (p. 15); Lambert (p. 10); Love (p. 15); Lucas (p. 15); Madayag (p. 15); Manning (p. 12); C. Martin (p. 19); J. Martin (p. 18); McKinney (p. 12); Melton (p. 16); Minard (p. 17); Riley (p. 12); Ruiz-Martinez (p. 13); Sanchez (p. 30); Sissac (p. 39); Snyder (p. 20); Wagner (p. 20); Willis (p. 14); Zmucki (p. 50)

would be deducted from their "bank" of PTO hours, but the pay check was not affected. (Clay Dec. ¶ 14) In the event that an employee had expended his PTO and took time off, his pay during that period would be reduced.

### Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986); *Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004); *Branham v. Snow*, 392 F.3d 896, 901 (7th Cir. 2004); *Windle v. City of Marion, Indiana*, 321 F.3d 658, 660-61 (7th Cir. 2003), *cert. denied*, 540 U.S. 873, 124 S.Ct. 873, 157 L.Ed.2d 133 (2003).  The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); *Lawrence*, 391 F.3d at 841. A fact is material if it is outcome determinative under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); *Ballance v. City of Springfield, Illinois Police Department*, 424 F.3d 614, 616 (7th Cir. 2005); *Hottenroth v. Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004); *Palmer v. Marion County*, 327 F.3d 588, 592 (7th Cir. 2003).  Even if the facts are not in dispute,

summary judgment is inappropriate when the information before the court reveals a good faith dispute as to inferences to be drawn from those facts. *Spiegula v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004); *Hines v. British Steel Corporation*, 907 F.2d 726, 728 (7th Cir. 1990). Finally, summary judgment "will not be defeated simply because motive or intent are involved." *Roger v. Yellow Freight Systems, Inc.*, 21 F.3d 146, 148 (7th Cir. 1994). *See also Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999); *Plair v E.J. Brach & Sons, Inc.*, 105 F.3d 343, 346 (7th Cir. 1997); *United Association of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1268 (7th Cir. 1990).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511

*See also Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-22 (2000)

(setting out the standard for a directed verdict); *Celotex Corp.*, 477 U.S. at 322-323, 106 S.Ct. at 2553; *Branham*, 392 F.3d at 901; *Lawrence*, 391 F.3d at 841; *Hottenroth*, 388 F.3d at 1027 (stating that a genuine issue is one on which "a reasonable fact finder could find for the nonmoving party"); *Schuster v. Lucent Technologies, Inc.*, 327 F.3d 569, 573 (7th Cir. 2003)(stating that a genuine issue exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party).

The Fair Labor Standards Act of 1938, 29 U.S.C. §201 *et. seq.*, provides that no employer shall require an individual to work more than forty hours in a single week unless that individual is compensated at one and one-half times his hourly rate for the hours above forty worked during that week. 29 U.S.C. §207(a)(1).  The Act also permits exceptions to this requirement for "bona fide executive, administrative or professional" employees, which are further described in regulations promulgated by the Secretary of Labor. 29 U.S.C. §212(a)(1). The court gives these regulations controlling weight. *See U.S. v. Wisconsin Power and Light Co.* 38 F.3d 329, 334 (7th Cir. 1994) (*quoting Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)("[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.").

In April 2004, the Secretary revised these regulations, including the definitions applicable to the executive, adminis-

13

trative, and professional exemptions to the maximum hours re-
quirement. 69 Fed. Reg. 22,260 (April 23, 2004). The updated
regulations, however, are not applied retroactively. ***Kennedy v.***
***Commonwealth Edison Company***, 410 F.3d 365, 368 (7th Cir. 2005).
The parties do not dispute, and the court agrees, that the claims
of Harrah's table game supervisors are governed according to the
prior regulations.

Under these regulations, the burden is on the employer to
show that an employee challenging the denial of overtime is
within an exception to the FLSA's requirement of overtime pay.
***Kennedy***, 410 F.3d at 370. The pertinent regulations describe
three exceptions: executive, professional, or administrative
employees. 29 C.F.R. §§541.101, 541.201, 541.300.  The court
construes these exceptions narrowly. ***Bankston v. Illinois***, 60
F.3d 1249, 1252 (7th Cir. 1995).

The parties dispute whether the table games supervisors fit
within either the administrative or the executive exceptions. In
either case, Harrah's first must show that the table games
supervisors were paid on a "salary basis." 29 C.F.R. §§541.1(f),
541.2(e)(1). The regulations provide a general rule that compen-
sation is on a salary basis if the employee "regularly receives
. . . a predetermined amount . . . not subject to reduction
because of variations in the quality or quantity of work per-
formed." 29 C.F.R. §541.118(a). The employee is not required to
show the occurrence of actual deductions, but he may meet this
standard by showing a policy that creates a significant likeli-

14

hood of such deductions. *Auer v. Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997)("The Secretary's approach rejects a wooden requirement of actual deductions, but in their absence it requires a clear and particularized policy - one which effectively communicates that deductions will be made in speci-fied circumstances.").

However, certain deductions do not disturb the conclusion that an employee is paid on a salary basis. For instance, "if an employee is absent for *a day or longer* [for personal reasons other than sickness or accident] his salaried status will not be affected if deductions are made from his salary for such ab-sences." 29 C.F.R. §541.118(a)(2)(emphasis added); *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 534 (7th Cir. 1999)("If an employer docks an employee's pay for partial day absences . . . the employee is not considered to be on a salary basis.").

The parties' dispute regarding the table games supervisors' status as salaried employees largely focuses upon deductions made by Harrah's. However, the parties have struggled in distinguish-ing salary from hourly wages. The deposition of plaintiff Marvin Ginsburg is illustrative:

> Q.   So, you don't receive an annual salary?
>
> A.   Um - the paycheck - you know, I work my
>      full week and I get my paycheck.
>
> Q.   Have you ever asked anyone whether or
>      not you were paid on an annual salary?
>
> A.   No

Q.    Okay. And, does your pay stay the same
      every week?

A.    Yes.

Q.    And isn't that amount based on your
      annual salary?

A.    Well, it is - it is my - you know, I get
      PTO so if I take a day off they take it
      out of my PTO bank, so it is always the
      same. I have a PTO built up.

Q.    So, your pay is the same every pay pe-
      riod?

A.    (Witness nodding)

Q.    I'm sorry?

A.    Yes.

Q.    Okay. And that amount, isn't it based
      upon your salary that you receive?

A.    I don't know that.
      ...

Q.    But is it possible?

A.    I just put in my hours and they pay me.

Q.    Okay. So, you don't know whether or not
      you receive an annual salary?

A.    No. I was hired hourly.

Q.    Okay. Well, you were hired hourly but
      you were promoted to Table Game Supervi-
      sor and were given an annual salary?

A.    (No response)

Q.    Is that correct?

A.    I don't know that. I just put in my
      hours and get my paycheck. So, if I take
      off a day they take the PTO.

16

Q.    Has anyone ever told you that you earned
      - upon your promotion in April, 2003,
      you would earn $42,000.00 annually.

A.    No, I don't remember that.

Q.    Okay. When you received your performance
      evaluation in April of 2004, did anyone
      tell you that you were receiving a raise
      to an annual salary of $43,260?

A.    I don't remember that.
      ...

Q.    How often are you paid?

A.    Every two weeks.

Q.    Has your pay ever been subject to actual
      deductions because of variations in -

A.    I know -

Q.    Variations in the quality of the quan-
      tity of your work?

A.    (No response)

Q.    Do you understand that you will be paid
      the same amount every week regardless of
      the number of hours that you work?

A.    Well, I - I don't understand that.

Q.    Do you - if you - do you understand that
      upon your promotion to Table Games Su-
      pervisor if you work 45 hours a week you
      will be paid the same regardless of if
      the next following week that you work 50
      hours?

A.    I understand that my paycheck is always
      the same.

Q.    Okay. Regardless of the number of hours
      you work?

A.    Yes.

(Ginsburg Dep. pp. 6-9)

17

Other representative testimony reaches a similar conclusion, but through a more direct path:

> Q.  The amount that appears on your paycheck is going to be your salary divided by 26, correct?
>
> A.  Correct.
>
> Q.  And the only time that it would not be your salary divided by 26 is when you have missed work and you've exhausted your paid time off, correct?
>
> A.  Correct.
>
> Q.  And then, in that case it would be deducted for a full day absence, correct?
>
> A.  Right.
>
> (Dutton Dep. p. 46)

Among the 31 plaintiffs, four resist the characterization of their pay as an annual "salary" as compared with an hourly rate of pay, specifically Louis Rarick, John Petrites, Wellington Okok, and Gene Martin. Plaintiff John Petrites stated that in order to determine his salary, he would have to calculate it, based upon the hourly rate of $21.13 an hour. (Dep. of John Petrites, p. 24.) However, Petrites, moments later, stated that his pay did not change from week to week, regardless of the number of hours that he worked. (Petrites Dep. p. 25) Wellington Okoh testified similarly when, after claiming that he was paid hourly, also stated that his pay was the same every two weeks regardless of the hours that he worked. (Dep. of Wellington Okoh, p. 14) Notwithstanding the occasionally muddled nature of the discussion, it is clear that there is no genuine issue regarding

the fact the table game supervisors regularly received a prede-
termined salary.

The plaintiffs argue that their pay still cannot be charac-
terized as salary according to the Secretary's regulations
because this salary was subject to partial day deductions.
Harrah's claims that the only instances of less than full-day
deductions were instances in which the plaintiffs utilized
intermittent Family and Medical Leave Act benefits.  However, the
plaintiffs assert that partial deductions went beyond these FMLA
occurrences. Plaintiff Diana Riley testified that she was subject
to partial day deductions, which she described as occurring
"anytime I would need a day off if I didn't have a PTO balance
accumulated." (Riley Dep. p. 13) Plaintiff Janice Martin made
reference to a single instance in which, due to a computer error,
Harrah's docked her pay for a partial day because of the mistaken
belief that she was on sick leave. Martin testified that Harrah's
corrected this error. (Martin Dep. pp. 18-19) Thomas Lambert also
testified that he had been subjected to deductions based upon
partial day absences. However, Lambert explained this occurrence
by stating that "They gave us PTO. I took a vacation, didn't have
enough so my paycheck was short the amount of hours that I didn't
have." (Dep of Thomas Lambert p. 10) Despite use of the word
"hours," Lambert's testimony, like Riley's, did not reference an
absence and corresponding deduction of less than a full day. In
this same testimony, Lambert later stated that prior to this
occurrence, his paycheck never had been subject to deductions for

19

partial day absences and remained the same every week regardless of the hours he worked. (Lambert Dep. p. 12) Similarly, Carlos Mayadag testified that he was paid an annual salary but that he was docked on an hourly basis. (Mayadag Dep. p. 15) Mayadag could provide no example of this occurrence and also acknowledged that it was possible that such a deduction never had been made from his pay check. (Mayadag Dep. p. 15) No evidence is presented to suggest that Mayadag's belief that he may be subject to such a deduction was based upon a "particularized policy" of Harrah's. *See Auer*, 519 U.S. at 461, 117 S.Ct. at 911.

There is nothing in the record to suggest that the pay received by the table game supervisors was anything but salary basis, as described by the regulations. The plaintiffs were paid a regular, predetermined amount.  The only deductions on which the record contains evidence are those plainly described by 29 C.F.R. §541.118(a)(2) as deductions that do not affect the salary basis status of the plaintiffs. Accordingly, the court concludes that Harrah's has met its initial burden of demonstrating that no genuine issue of fact exists regarding the plaintiffs' status as salary basis employees.

Harrah's next must show that the duties of the table games supervisors bring them within the exceptions to the overtime pay requirement. Harrah's asserts that the table games supervisors qualify as both administrative and executive employees.

Under the prior regulations, the administrative employee exception was gauged according to either a long test or a short

20

test. The short test was applicable to those employees who earned more than $250 per week, undisputably including Harrah's table game supervisors. 29 C.F.R. §541.214 ("Special Proviso For High Salaried Administrative Employees") Under the short test, an exempt administrative employee is one whose "primary duty consists of . . . (1) the performance of office or nonmanual work directly related to management policies or general business operations . . . and (2) who customarily and regularly exercises discretion and independent judgment." 29 C.F.R. §541.2; *Kennedy*, 410 F.3d at 370. The regulations state that a primary duty is one that generally involves more than 50 percent of the employee's time, but the regulations also caution that time alone is not the sole test. 29 C.F.R. §§541.103, 541.206(b). When less than 50 percent of an employee's time is spent on work related to general business operations, other factors that speak to this consideration also include

> the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary powers, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

> 29 C.F.R. §541.103

*See also* ***Jackson v. Go-Tane Services, Inc***., 56 Fed.Appx. 267, 271 (7th Cir. 2003).

The regulations further clarify that the phrase "directly related" to management policies or general business operations

limits the application of the administrative exception only to
those who perform work of substantial importance to the company.
29 C.F.R. §541.205(b)(2)("An employee performing routine clerical
duties obviously is not performing work of substantial importance
to the management or operation of the business even though he may
exercise some measure of discretion and judgment as to the manner
in which he performs his clerical tasks.").  These determinations
must be made in light of all the facts of a particular case. 29
C.F.R. §541.206(b). In **Kennedy**, the Seventh Circuit further
concluded that "managing others is, by definition, of substantial
importance to the management of a business." **Kennedy**, 410 F.3d at
373.

        The exercise of independent judgment and discretion, the
second element of the analysis, regards the expectation that the
employee compare, evaluate, and ultimately choose from among
competing courses of action. 29 C.F.R. §541.207(a); **Kennedy**, 410
F.3d at 374. The regulations, recognizing that almost all employ-
ees use some discretion, limit this factor to "decisions in
significant matters." 29 C.F.R. §541.207(d)("they must be exer-
cised with respect to matters of consequence."). However, there
is no requirement that the employee make such decisions with
finality or in isolation from superiors. **Kennedy**, 410 F.3d at 374
(*citing* **Piscione**, 171 F.3d at 540 (7th Cir. 1999)). Finally, a
discretionary task is performed "customarily and regularly"
according to the regulations, when its "frequency is more than
occasional but which, or course, may be less than constant." 29

C.F.R. §541.207(g). "Customarily and regularly" requires the performance of discretionary tasks as part of the day-to-day performance of duties.

Harrah's claims that the supervisors' routine oversight of dealers, opening and closing of games tables, adjusting bet minimums, replacing equipment, involvement in the assessment and hiring of dealers, and conducting subsequent dealer performance appraisals were administrative tasks. The table game supervisors acknowledge that their tasks were nonmanual but argue that they were not administrative because they were not of substantial importance to the company.

First, the plaintiffs note that Harrah's own policies did not describe the table games supervisors, Salary Grade 17 employees, as "manager level" or "key," a distinction that begins only with Salary Grade 18. This argument fails to recognize that the regulations define whether an employee fits within the exemption, not labels created by the employer. That Harrah's considered an employee to hold "unique knowledge" of the company is not synonymous with the Department of Labor's regulations defining an exempt administrative employee.  The plaintiffs provide no support for merging Harrah's classifications and the secretary's regulations. *See* 29 C.F.R. §541.202(b)(1)("A title alone is of little or no assistance in determining the true importance of an employee to an employer or his exempt or non-exempt status under the regulations in subpart A of this part.").

23

The plaintiffs, regardless of whether they had served as "pencils," regularly opened and closed game tables, approved customer purchases over $10,000, adjusted bet minimums, and rated regular customers' activities at games tables. The plaintiffs provide little argument that these activities were not administrative and instead argue that, if they did perform tasks that were related to management policies or general business operations, these efforts amounted to less than 50 percent of their job duties and could not be considered "primary duties." However, in making this argument, the plaintiffs simply ignore many of the supervisors undisputed routine tasks.

The plaintiffs argue that performance appraisals were completed only twice a year and the opening and closing of the game tables were minor activities that occurred at only the very beginning and end of each shift.  The arguments present far too literal an accounting of the plaintiffs' time. While the physical PAFs may have been generated only biannually, the content that a table games supervisor was expected to address in a PAF reflected insight into dealers gained through day-to-day observation of that dealer, the issuance by the plaintiff of warnings or commendations, and the development by the plaintiff of improvement plans for the dealers on their "team" over an on-going period of time.  As illustrated by plaintiff Cody Paredes' instructions regarding a PAF, the supervisor was expected to "identify [the dealer's] weak areas [and] then explain how he can develop in

24

them." Plaintiff Clifford Jenkins also testified regarding the on-going nature of the supervisors' review of dealers:

> Q.   You are responsible for communicating and enforcing Harrah's expectations with regards to dealers, right?
>
> A.   Right.
>
> Q.   And you do that on a daily basis?
>
> A.   Yes.
>
> Q.   You complete reviews on dealers?
>
> A.   Yes.
>
> (Jenkins Dep. p. 39)

The plaintiffs argue that "table game supervisors did not have the authority to promote, reward or discipline dealers." (Statement of Genuine Issues, ¶ 30) Plaintiffs' use of the record verges on misrepresentation. In this instance, they support this assertion with the testimony of Byron Clay.  However, Clay's statement clearly indicates that the plaintiffs directly disciplined dealers and at least recommended firing:

> Q.   Another distinction you described was discipline. What authority did table games supervisors have in regard to discipline of other employees?
>
> A.   First warning, second warning, counseling, coaching and counseling on a regular basis, recommend discharge, suspensions.
>
> (Clay Dep. P. 43)

The administrative nature of the supervisors also is made clear based upon the supervisors' relationship to Harrah's customers. These activities are beyond routine clerical tasks.

The table games supervisors are the first level of table games department employees who may issue "service recoveries" and "comps" to Harrah's customers. The plaintiffs also are the first, and when a casino manager is not on the floor, the primary employees responsible for identifying odd behavior or irregularities at the gaming tables. The administrative nature of this role is not diminished because the surveillance department might assist in this effort or because a manager may provide the ultimate resolution to a customer experiencing a problem at a gaming table. *See* 29 C.F.R. §541.205(c)(6)("The fact that there are a number of other employees of the same employer . . . performing identical work does not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business."); *Shaw v. Prentice Hall Computer Publishing, Inc*., 151 F.3d 640, 643 (7th Cir. 1998).

Regarding the second element of the analysis, the plaintiffs routinely exercised discretion with respect to significant matters in the operation of the casino. Harrah's claims that the supervisors exercised discretion and independent judgment in the coaching, discipline and commendation of dealers, the development of performance appraisals, the decision to issue service recoveries and "comps," and the decision to open or close table games.

The plaintiffs provide little counter argument to these assertions and again focus on the frequency of these responsibilities. They claim that the completion of the performance ap-

26

praisal occurred only twice a year and the issuance of service recoveries occurred "only when a customer was unhappy with his gaming experience." These tasks, the argument goes, may illustrate the exercise of discretion but are too infrequent to be considered part of their day-to-day tasks.

The plaintiffs again read the regulations too literally. Day-to-day frequency does not require daily occurrence. The old regulations, perhaps unhelpfully, state that the appropriate frequency is "more than occasional but . . . less than constant." Despite some difficulty pinpointing a concrete standard, the plaintiffs' presumption that only a daily occurrence will suffice is not supportable. *See Austin v. CUNA Mutual Insurance Society*, ___F.R.D.___, 2006 WL 3086315 at *1 (W.D. Wis. 2006)(granting summary judgment against employee who "periodically" made independent decisions.). More importantly, regardless of whether Harrah's experienced unhappy customers on a daily basis, it is undisputed that every such occurrence was the responsibility of the table games supervisor to identify and address initially.

The plaintiffs attempt to deflate this argument by saying that non-exempt employees, specifically dealers, also were capable of issuing service recoveries to dissatisfied customers. This statement, however, provides a second example of plaintiffs' misuse of the record. The testimony of plaintiffs Wills, Baranowski, Paredes, and casino manager Joe Barrett do not provide support to this argument. Wills, for instance, directly was asked whether dealers may issue service recoveries:

27

> Q.   Okay. And who - can dealers issue ser-
>      vice recoveries?
>
> A.   No.
>
> Q.   So it would only be supervisors and
>      above?
>
> A.   Yes.
>
> (Wills Dep. pp. 88-89)

Similarly, Baranowski, Paredes, and Barrett, who generally testified regarding service recoveries, never addressed the question of whether a dealer could issue service recoveries. Finally, plaintiffs point to a paragraph in the pre-printed PAF form used to assess a dealer's performance which asks the evaluator to rate how the dealer "handles customer issues using the service recovery process." (Plaintiffs' Ex. G) The fact that a dealer "uses the process" is not in dispute, and the sentence that plaintiffs point to does not speak to the question of whether a dealer was authorized to issue recoveries directly. In light of consistent testimony to the contrary, the court does not accept the plaintiffs' conclusion.

Finally, the plaintiffs assert that their role in evaluating new dealer applicants was limited to little more than gauging objective criteria such as the number of hands-per-hour a new applicant could deal, or the applicant's technical knowledge of a game's rules. However, the plaintiffs do not dispute the testimony that describes the exercise of discretion in this role in assessing an applicant's less tangible attributes, such as attitude and personality. Instead, plaintiffs note that they were

not capable of ultimately hiring or firing personnel. This conclusion, however, does not foreclose the finding that the plaintiffs were administrative employees. *See e.g.* **McCallister v. Transamerica Occidental Life Insurance Company**, 325 F.3d 997, 1001 (8th Cir. 2003) ("The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."). *See also* **Stricker v. Eastern Off Road Equipment, Inc.**, 935 F.Supp. 650, 657 (D. Md. 1996).

The court concludes that summary judgment is appropriate in Harrah's favor on the plaintiffs' claim under the Fair Labor Standards Act. Because the court concludes that the table games supervisors were administrative employees, Harrah's argument that they also were exempt as executive employees is moot.

The plaintiffs' second count is a state law claim asserting breach of an oral agreement to provide "comp" time. Having dismissed the sole federal claim against Harrah's, the court declines to exercise supplemental jurisdiction over a claim arising from separate occurrences and under state law. **Williams v. Aztar Indiana Gaming Corp.**, 351 F.3d 294, 300 (7th Cir. 2003) ("With the dismissal of William's RICO claim, the sole basis for invoking federal jurisdiction is nonexistent and the federal courts should not exercise supplemental jurisdiction over his remaining state law claims.").

Accordingly, the defendants' motion for summary judgment (DE 91) is **GRANTED** with respect to Count I, violation of the Fair

Labor Standards Act. Count II is **DISMISSED WITHOUT PREJUDICE**. The plaintiffs' motion for a hearing (DE 104) is **DENIED**. The clerk is **DIRECTED** to enter judgment in this matter and terminate this case.

ENTERED this 4th day of December, 2006

s/ ANDREW P. RODOVICH
United States Magistrate Judge

30